## IN THE UNITED STATES BANKRUPTCY COURT FOR THE
## EASTERN DISTRICT OF TENNESSEE

In re

Case No. 12-33943

KAREN L. MILLER

Debtor

## MEMORANDUM ON
## CONTESTED INVOLUNTARY PETITION

**APPEARANCES:**   GENTRY, TIPTON & MCLEMORE, P.C.
Maurice K. Guinn, Esq.
Post Office Box 1990
Knoxville, Tennessee  37901
Tyler C. Huskey, Esq.
2430 Teaster Lane
Suite 210
Pigeon Forge, Tennessee  37863
Attorneys for Petitioning Creditors Tennessee State Bank,
Charles A. McGinnis,  Melanie McGinnis, and
Housholder Family Trust

HALE, LYLE AND RUSSELL
Mary Foil Russell, Esq.
Post Office Box 274
Bristol, Tennessee  37621
Attorneys for Debtor

SAMUEL K. CROCKER, ESQ.
UNITED STATES TRUSTEE
Patricia C. Foster, Esq.
Howard H. Baker, Jr. United States Courthouse
800 Market Street
Suite 114
Knoxville, Tennessee  37902
Attorneys for United States Trustee

**RICHARD STAIR, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

Before the court are the following: (1) the Involuntary Petition filed by Tennessee State Bank on September 28, 2012, as amended on February 4, 2013, and joined by the Housholder Family Trust, Charles A. McGinnis, and Melanie McGinnis pursuant to the Joinders or Intervention by Additional Petitioning Creditors filed on November 8, 2012; and (2) the Answer to Involuntary Petition filed by the Debtor on October 19, 2012, as amended on October 25, 2012.

The trial on the contested Involuntary Petition was held on February 19, 2013.  The record before the court consists of Stipulations filed by the parties on February 13, 2013, fifty-two exhibits admitted into evidence, and the testimony of five witnesses, James Housholder and Julia Housholder by deposition, Charles McGinnis, Shelly Spurgeon, and Karen Miller.

This is a core proceeding.  28 U.S.C. § 157(b)(2)(A) and (O) (2006).

# I

Tennessee State Bank commenced this involuntary bankruptcy case on September 28, 2012, by the filing of an Involuntary Petition against Karen L. Miller under Chapter 7 of the Bankruptcy Code.[1]  The Debtor filed her Answer to the Involuntary Petition on October 19, 2012, which she amended on October 25, 2012, to attach a List of Creditors that included, *inter alia*, Tennessee State Bank.  On November 8, 2012, three additional creditors, the Housholder Family Trust, Melanie McGinnis, and Charles A. McGinnis, joined in the petition pursuant to 11 U.S.C. § 303(c).

---

[1] The Involuntary Petition filed on September 28, 2012, stated that the Debtor owed Tennessee State Bank, $7,394,727.11, the same amount claimed owing by her husband, Gerald L. Miller, in Case No. 12-33942.  On February 4, 2013, Tennessee State Bank filed an Amended Involuntary Petition changing the amount owed to $1,159,089.32.  *See* TRIAL EX. 6; TRIAL EX. 8.

2

As set forth in the Pretrial Order entered on November 1, 2012, the court is to resolve the following issues:

> A.  Whether the Involuntary Petition should be dismissed because the Debtor has twelve or more creditors who hold claims that are not contingent as to liability or the subject of a bona fide dispute as to liability or amount with the claims of at least three of such creditors aggregating at least $14,425.00 more than the value of any lien on property of the Debtor securing such claim?

> B.  Whether if Tennessee State Bank is able to proceed as the sole Petitioning Creditor, it holds a claim against the Debtor that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount of at least $14,425.00 more than the value of any lien on property of the Debtor securing such claim?

> C.  Whether as of the petition date the Debtor was generally paying her debts as they came due pursuant to 11 U.S.C. § 303(h) unless such debts are the subject of a bona fide dispute as to liability or amount?

As set forth in the Stipulations filed on February 13, 2013, the parties agree that, for the purposes of the trial, Charles A. McGinnis and Melanie McGinnis are to be treated as one petitioning creditor. STIPS. at ¶ 7.

## II

As material to this contested Involuntary Petition, the Bankruptcy Code provides the following:

> (b) An involuntary case against a person is commenced by the filing . . . of a petition under chapter 7 . . . of this title –

> > (1) by three or more entities, each of which is . . . a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount, . . . if such noncontingent, undisputed claims aggregate at least $14,425 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;

> > (2) if there are fewer than 12 such holders, excluding any employee or insider of such person and any transferee of a transfer that is voidable under

3

section 544, 545, 547, 548, 549, or 724(a) of this title, by one or more of such
holders that hold in the aggregate at least $14,425 of such claims[.]

. . . .

(h) If the petition is not timely controverted, the court shall order relief against the
debtor in an involuntary case under the chapter under which the petition was filed.
Otherwise, after trial, the court shall order relief against the debtor in an involuntary
case under the chapter under which the petition was filed only if –

(1) the debtor is generally not paying such debtor's debts as such debts
become due unless such debts are the subject of a bona fide dispute as to
liability or amount[.]

11 U.S.C. § 303.  In opposition to the Involuntary Petition, the Debtor asserts that Tennessee State

Bank is not qualified to be a petitioning creditor because there is a bona fide dispute as to her

liability due to Tennessee State Bank wrongfully declaring her notes in default, accelerating

payments on her notes, and cross-collateralizing her notes with her husband's notes.  She also argues

that Charles and Melanie McGinnis, because they are secured creditors, are ineligible to be a

petitioning creditor.[2]  Finally, the Debtor argues that with the exception of the Tennessee State Bank

---

[2] In her Trial Memorandum of Law Opposing Involuntary Petition filed on February 13, 2013, the Debtor
acknowledges the court's decisions in the Memorandum on Motion for Summary Judgment That Tennessee State Bank
is Not Qualified as a Petitioning Creditor and the Memorandum on Contested Involuntary Petition, Motion to Determine
Venue, and Motion to Alter or Amend Order Denying Motion for Summary Judgment filed on December 7, 2012, and
January 9, 2013, respectively, in her husband's case, *Gerald L. Miller*, Case No. 12-33942.  She states, however, that
she does not agree with the court's determinations that the claims of Tennessee State Bank and the Housholder Family
Trust are not the subject of a bona fide dispute as to liability or amount and that she fully adopts the arguments set forth
by Mr. Miller; however, because she expects the court's ruling to be the same, she is merely raising the issues and
preserving them for later argument.

Nevertheless, the court, pursuant to Rule 201 of the Federal Rules of Evidence, takes judicial notice of its ruling
in the January 9, 2013 Memorandum Opinion, and, for the reasons set forth therein, likewise finds in this case that the
Housholder Family Trust holds an unsecured claim in the amount, at a minimum, of $420,000.00 representing $3,750.00
for each of the one hundred and twelve months remaining through July 2022, on a thirty-year ground Lease for real
property located at 3174 Parkway, Pigeon Forge, Tennessee, which was executed on July 3, 1992, between Katherine
Housholder, Marceil H. Perry, and James A. Housholder, collectively, as landlords, and Santo and Deborah Baiamonte
as lessees, which was subsequently assigned by the Baiamontes to the Debtor and Gerald L. Miller pursuant to an
Assignment of Lease With Landlord's Consent dated July 13, 2004, an Assignment of Lease for Collateral Purposes,
granting a lien in the rents owed to the Millers for the premises to Tennessee State Bank as collateral for a $600,000.00
loan, and a Landlord's Agreement With Lender, granting Tennessee State Bank the right to receive notice of any defaults
(continued...)

debt, which she claims is disputed as to liability, she was generally paying her debts as they came

due.

## A

The first issue raised by the Debtor is that Tennessee State Bank may not be a petitioning

creditor because its claim is the subject of a bona fide dispute as to liability and amount. "The initial

burden rests on the petitioning creditors to establish a prima facie case that their claims are not

contingent and that no bona fide dispute exists regarding such claims." *In re Square at Falling Run*,

LLC, 472 B.R. 337, 341 (Bankr. N.D. W. Va. 2012). Although not defined within the Bankruptcy

Code, within the context of involuntary petitions, "[a] claim is subject to a bona fide dispute 'if there

is either a genuine issue of material fact that bears upon the debtor's liability, or a meritorious

contention as to the application of law to undisputed facts.'" *In re Hicks*, 2011 WL 6000861, at *2,

2011 Bankr. LEXIS 4678, at *5 (Bankr. E.D. Tenn. Nov. 30, 2011) (quoting *Mktg. & Creative

Solutions, Inc. v. Scripps Howard Broad. Co. (In re Mktg. & Creative Solutions, Inc.)*, 338 B.R. 300,

305 (B.A.P. 6th Cir. 2006)). Nevertheless, the court is not required to "resolve any genuine issues

of fact; it must only determine that such issues exist." *Hicks*, 2011 WL 6000861, at *2, 2011 Bankr.

LEXIS 4678, at *5 (quoting *Riverview Trenton RR Co. v. DSC, Ltd. (In re DSC, Ltd.)*, 486 F.3d 940,

945 (6th Cir. 2007)) (brackets and citations omitted). "The bankruptcy court is expected to make an

inquiry sufficient to determine whether a legitimate question exists about the application of law to

the undisputed facts presented. The debtor must have a 'legitimate legal or factual basis' to

---

[2](...continued)
in the Housholder Family Trust lease, to cure any monetary defaults, and to become obligated on the lease. *In re Miller*,
No. 12-33942, slip op. at 14-15, 18-19 (Bankr. E.D. Tenn. Jan. 9, 2013).

challenge the claim." *Mktg. & Creative Solutions, Inc.*, 338 B.R. at 305 (quoting *Nat'l City Bank v. Troutman Enters., Inc. (In re Troutman Enters., Inc.)*, 253 B.R. 8, 12 (B.A.P. 6th Cir. 2000)). "In applying this standard, the Court must determine 'whether there is an objective basis for either a factual or a legal dispute as to the validity of the debt. The court need not determine the probable outcome of the dispute, but merely whether one exists.'" *In re Everett*, 178 B.R. 132, 140 (Bankr. N.D. Ohio 1994) (quoting *In re Data Synco, Inc.*, 142 B.R. 181, 182 (Bankr. N.D. Ohio 1992) (citations omitted)). Petitioning creditors bear the burden of establishing a prima facie case that no bona fide dispute exists, after which the burden shifts to the involuntary debtor to demonstrate the contrary. *In re AMC Investors, LLC*, 406 B.R. 478, 484 (Bankr. D. Del. 2009).

The Debtor does not dispute that she is indebted to Tennessee State Bank under the terms of four notes: (1) loan no. xxxx5233 dated November 12, 2010, in the amount of $146,416.24 to Gerald L. Miller and Karen L. Miller; (2) loan no. xxxx8790 dated August 4, 2009, in the amount of $548,059.83 to Gerald L. Miller and Karen L. Miller; (3) loan no. xxxx0637 dated October 31, 2008, in the amount of $123,750.00 to Gerald L. Miller and Karen L. Miller; and (4) loan no. xxxx2385 dated December 30, 2008, in the amount of $68,000.00 to Gerald L. Miller and Karen L. Miller. TRIAL EX. 1; TRIAL EX. 2; TRIAL EX. 3; TRIAL EX. 4. She also does not dispute that, as of September 28, 2012, the date upon which the Involuntary Petition was filed, these notes were not paid. As reflected in Trial Exhibit 5, prepared by Tennessee State Bank, the balances due on each note, not including attorney's fees, were $710,934.13 on loan no. xxxx8790, $172,087.82 on loan no. xxxx5233, $141,797.95 on loan no. xxxx0637, and $82,028.29 on loan no. xxxx2385 as of September 28, 2012, for a total of $1,106,848.19. TRIAL EX. 5. Instead, the Debtor contends that there is a bona fide dispute as to liability based upon the cross-collateralization and Tennessee

6

State Bank's acceleration of her notes after the default by her husband, Gerald L. Miller, on his notes

with the bank.  As proof of this bona fide dispute, Ms. Miller relies primarily upon the lawsuit that

she filed in the Chancery Court for Sevier County, Tennessee, on January 27, 2012, in which she

made the following allegations:

> 3.  This action involves alleged defaults on certain promissory notes secured by
> deeds of trust on property located in Sevier County, Tennessee.  Miller is requesting
> the court declare the rights and liabilities of the parties under the various documents
> and for damages for wrongful conduct of TSB.  Venue and Jurisdiction are proper
> in this county.

> 4.  Over a period of years, the [sic] Miller, along with her husband, executed several
> promissory notes in favor of TSB.  The notes were on the preprinted forms of TSB.

> 5.  The notes are secured by certain Deeds of Trust which preprinted forms were
> prepared by the attorney for TSB.  At no time were the documents open for
> negotiation.  They are contracts of adhesion.

> 6.  The Deeds of Trust contained standard boilerplate language regarding cross
> collateralization and cross default of the obligations of Miller.  Nevertheless, at no
> time did either Miller or TSB treat the obligations as being subject to cross
> collateralization and cross default.  Additionally, at no time did TSB comply with the
> state and federal statutory requirements to have the same cross collateralized and
> cross defaulted.  Miller requests that the Court declare the obligations are not subject
> to cross collateralization or cross default.

> 7.  Miller's husband also had executed a promissory note in the amount of
> $2,880,000.00 in favor of TSB to which Miller was not a party.  At a renewal of that
> loan, TSB, for the first time, had the [sic] Miller's husband sign a statement and a
> letter agreement attempting to cross default and cross collateralize unrelated loans
> including the loans of Miller with that loan.  At no time did the [sic] Miller sign any
> such documentation nor was she notified.

> 8.  TSB declared the promissory note of the [sic] Miller's husband described in
> Paragraph 6 to be in default and accelerated the principal of the same.  Additionally,
> TSB increased the interest rate on the same to a usurious rate of interest.

> 9.  At the same time, despite the fact Miller was not in default of her obligations
> under any note, TSB declared her obligations to be in default and accelerated the
> principal of the same.  Additionally, TSB increased the interest rate on her various

7

notes to a usurious rate of interest.  TSB refused to allow Miller to make the payments that were due under the notes and refused to allow a payoff of the same.

10.     Miller would state, in fact the obligations are not subject to cross collateralization or cross default.  The actions of TSB are a breach of contract and the covenant of good faith and fair dealing.  Additionally, TSB has fraudulently misrepresented the loan documents.

11.  Additionally, TSB is attempting to illegally link commercial loans of Miller's husband and others with her obligations, which are not commercial.  The artificial connection of the loans and the corresponding usurious interest charges are an attempt to hide loan losses and lack of profitability of TSB and garner it income to which it is not entitled to cover its losses.  This is prohibited by state and federal statutes.

12.  Further, Miller, on numerous occasions, has requested the payoff amounts for her loans so she can pay TSB and obtain releases of the Deeds of Trust.  TSB has failed to respond to Miller in any manner.  This failure to respond allows TSB to attempt to collect is usurious interest and is a restraint in alienation of Miller's property.

13.  Additionally, TSB has failed to liquidate its collateral for the loan described in Paragraph 6 to determine the amount of any deficiency, if any.  These actions, together with the other actions of TSB, are a breach of its covenant of good faith and fair dealing, breach of contract, and are a tortious [sic] interference with the rights of Miller.

14.  TSB further has asserted that these obligations are cross collateralized and cross defaulted with other obligations of Miller and they in fact are not.  Miller has been damaged by these claims.  Such actions, together with the other actions of TSB are an unlawful restraint against alienation of property and are a further breach of their contracts and are a tortuous interference with Miller's business relationships.  The actions of TSB described above and execution of the documents are fraudulent.  Miller has been damaged by those acts.

15.  TSB failed to disclose the material terms of its agreements and misrepresented the terms of its agreements.  The misrepresentations and failure to disclose were and are fraudulent and material.  Because of the material misrepresentations, there could not have been a meeting of the minds on the loan documents.  Miller has been damaged by those misrepresentations and that failure.  She has relied to her detriment of [sic] TSB.

16.     The misrepresentations and concealment of TSB are negligent misrepresentation.  Alternatively, the misrepresentations and concealment of TSB

8

amount to intentional misrepresentation and concealment or fraud in the inducement. Miller has been damaged by those misrepresentations and that fraud.

17.    TSB has violated its fiduciary duty to Miller and violated the terms of the Tennessee Consumer Protection Act and federal statutes related to credit disclosure by virtue of the actions set forth herein.    Miller has been damaged been damaged [sic] by those actions and violations.    She is entitled to treble or punitive damages.

TRIAL EX. 30 at 1-4.    Additionally in support of her argument, the Debtor relies upon the fact that

Tennessee State Bank did not require her to sign, for any of the four Notes, a TSB Limited Loan

Agreement Form dated November 10, 2010, that was executed by her husband in association with

two of his loans which contains the following language:

3.    The occurrence of any event of default/breach under this agreement or any of the other Loan Documents shall cause the interest rate to rise on all loans, for which you personally and/or your company are liable or have pledged collateral, up to the maximum amount allowed by Tennessee Law **and/or** shall terminate any obligations on the part of Bank to make or continue the Loan and, at the option of Bank, shall make all sums of interest and principal remaining on the Loan immediately due and payable, without notice of default, presentment or demand for payment, protest or notice of non-payment or dishonor or other notices or demand of any kind or character.

COLL. TRIAL EX. 27.

Ms. Miller did not, however, present any proof other than her testimony, which was rebutted

by the testimony of Shelly Spurgeon, Senior Vice President of the Special Assets Department of

Tennessee State Bank, as well as the loan documents themselves, to support her argument that the

loans were not meant to be cross-collateralized or cross-defaulted.    First, the documents

unambiguously contain cross-collateralization provisions.    The Note for loan no. xxxx5233, the

purpose of which was "BUSINESS: RENEWAL FIX RATE/ORIGINAL TO PURCHASE

CONVENIENCE STORE[,]" states, at the bottom of the first page, directly below the purpose, the

following additional terms: "THIS LOAN IS SECURED BY LEASEHOLD DEED OF TRUST,

ASSIGNMENT OF LEASE FOR COLLATERAL PURPOSES & SECURITY AGREEMENT

DATED 10/17/00 & FOUR PARTY AGREEMENT DATED 10/3/00, LANDLORD'S

AGREEMENT WITH LENDER DATED 9/19/00 & UCC'S [sic]." COLL. TRIAL EX. 1.  The Note

also states, in the first sentence of the first paragraph of the Additional Terms of the Security

Agreement section, the following cross-collateralization language:  "This agreement secures this

note and any other debt I have with you, now or later." COLL. TRIAL EX. 1.  The Note also states,

in the final paragraph of the Ownership and Duties Towards Property section of the Additional

Terms:

> If I fail to perform any of my duties under this security agreement, or any mortgage,
> deed of trust, lien or other security interest, you may without notice to me perform
> the duties or cause them to be performed.  Your right to perform for me shall not
> create an obligation to perform and your failure to perform will not preclude you
> from exercising any of your other rights under the law or this security agreement.

COLL. TRIAL EX. 1.  On page 3 of the Note, which is also the signature page, the Default paragraph

under ADDITIONAL TERMS OF THIS NOTE contains the following language:

> DEFAULT – I will be in default if any one or more of the following occur: (1) I fail
> to make a payment on time or in the amount due; . . . (3) I fail to pay, or keep any
> promise, on any debt or agreement I have with you[.]

COLL. TRIAL EX. 1.  Additionally, the Leasehold Deed of Trust securing the Note provides, in

material part, at pages 1 and 2 and paragraph 24 on page 4:

> TO HAVE AND TO HOLD the Property to the said Trustee, his successors,
> assigns and successors in trust, forever;
>
> IN TRUST, TO SECURE to Lender the following:  (a) the repayment of the
> indebtedness evidenced by a certain promissory note made by Gerald L. Miller and
> wife, Karen L. Miller (sometimes hereinafter referred to as "Borrower") dated
> 10-17-00 (herein "Note"), in the sum of Three Hundred Forty Thousand and 00/100
> Dollars ($340,000.00, with principal and interest payable as provided in said Note
> and with the balance of the indebtedness, if not sooner paid, due and payable on
> 10-17-2005, together with all renewals, modifications, and extensions of said

10

indebtedness; . . . (d) the payment of any and all other indebtedness, whether direct or indirect, now or hereafter owing to Lender by Borrower, or by any individual or entity included in the term Borrower, regardless of the type, class, or purpose of any such other indebtedness, and however such indebtedness is evidenced, including, without limitation, the repayment of any Future Advances made by Lender pursuant to paragraph 20 of this instrument (herein "Future Advances"), together with interest thereon.    All of the above shall be hereinafter referred to collectively as the "Indebtedness."

24.    ACCELERATION; REMEDIES.    If Grantor or Borrower (a) shall pay the indebtedness when due, according to its terms, (b) shall pay promptly all taxes, assessments, ground rents, and other charges against the Property when due, (c) shall keep up repairs, (d) shall keep the Property insured as provided herein, (e) shall pay any and all other sums when due, as herein provided, and (f) shall otherwise perform all of the covenants and conditions contained herein, then this trust conveyance shall be of no further force or effect.    In such case, Lender shall execute and record a release of this Deed of Trust at Grantor's expense.    Otherwise this trust conveyance shall remain in full force and effect, and, at the option of the lawful owner and holder of the Indebtedness, all remaining unpaid Indebtedness and all Installments thereof shall be due and payable at once, without notice, upon any of the following events of default:

      a.  Failure to pay the Indebtedness when due according to its terms and as required herein;

. . .

      d.  Default under any loan agreement (Construction Loan Agreement, Loan and Security Agreement, Security Agreement, Note, Deed of Trust, etc.) entered into with Lender in connection with the Indebtedness[.]

COLL. TRIAL EX. 1.

The Note for loan no. xxxx8790, the purpose of which was "BUSINESS: RENEWAL/ORIGINAL PURCHASE LEASEHOLD & IMPROVEMENTS[,]" contains the following additional terms: "THIS LOAN IS SECURED BY LEASEHOLD DEED OF TRUST DATED 7/13/04, LANDLORD'S AGREEMENT WITH LENDER DATED 7/13/04, ASSIGNMENT OF LEASE WITH LANDLORD'S CONSENT DATED 7/13/04, &

ASSIGNMENT OF LEASE FOR COLLATERAL PURPOSES DATED 7/13/04." COLL. TRIAL

EX. 2. This Note contains the identical language quoted from Note no. xxxx5233 on pages two and

three, as does the Leasehold Deed of Trust, with the exception of the amount of the indebtedness,

on page 2 and in paragraph 24. *See* COLL. TRIAL EX. 2. Similarly, the Notes for loan no. xxxx0637,

the purpose of which was "BUSINESS:  PURCHASE LAND[,]" and loan no. xxxx2385, the

purpose of which was "BUSINESS: PURCHASE OF 1.87 ACRES ON HAPPY HOLLOW RD[,]"

include the same language, as do the Deed of Trust dated October 31, 2008, and the Deed of Trust

dated January 5, 2009, securing the Notes, respectively. *See* COLL. TRIAL EX. 3; COLL. TRIAL EX. 4.

Finally, with respect to the Notes, on October 26, 1998, the Debtor, along with Gerald L.

Miller, Charles A. McGinnis, Melanie McGinnis, and Cove Mountain Realty, Inc., executed a Deed

of Trust:

> IN TRUST, TO SECURE to Lender the following: (a) the repayment of the
> indebtedness evidenced by a certain promissory note made by GERALD L. MILLER
> and CHARLES A. McGINNIS (sometimes hereinafter referred to as "Borrower")
> dated 10/26/98 (herein "Note"), in the sum of TWO HUNDRED THIRTY THREE
> THOUSAND SEVEN HUNDRED FORTY & 83/100 Dollars ($233,740.83), with
> principal and interest payable as provided in said Note and with the balance of the
> indebtedness, if not sooner paid, due and payable on OCTOBER 26, 2003, together
> with all renewals, modifications, and extensions of said indebtedness; (b) the
> payment of all other sums advanced in accordance herewith to protect the security
> of this Deed of Trust together with interest and charges thereon; (c) the performance
> of the covenants and agreements herein contained; (d) the payment of any and all
> other indebtedness, whether direct or indirect, now or hereafter owing to Lender by
> Borrower, or by any Individual or entity included in the term Borrower, regardless
> of the type, class, or purpose of any such other indebtedness, and however such
> indebtedness is evidenced, including, without limitation, the repayment of any Future
> Advances made by Lender pursuant to paragraph 20 of this Instrument (herein
> "Future Advances"), together with interest thereon.  All of the above shall be
> hereinafter referred to collectively as the "Indebtedness."

TRIAL EX. 13 at 2.

12

Ms. Spurgeon testified that the last payment received from the Debtor by Tennessee State Bank on any of her Notes was in July 2011, which represented the payment for June 2011.  During her testimony, the Debtor acknowledged that when Tennessee State Bank declared her Notes in default in July 2011, she had been late on payments to the bank, that because of the disputes she had with Tennessee State Bank about the Notes, she had stopped making payments on them, that there were past due property taxes owed on real property securing the Notes, and, although now paid and released, that Notices of Federal Tax Liens were recorded against her and Gerald L. Miller for past due income taxes: (1) on May 17, 2011 in the amount of $171,974.51; and (2) on July 25, 2011 in the amount of $28,833.60.  COLL. TRIAL EX. 53.  Under the terms of the Notes she executed, any of the foregoing events constituted a default, irrespective of any cross-collateralization or cross-default.

Accordingly, the court finds that the claim of Tennessee State Bank is not the subject of a bona fide dispute as to liability or amount.[3]

---

[3] A portion of the Debtor's state court lawsuit is based upon the interest rate charged by Tennessee State Bank; however, Ms. Spurgeon testified that the calculations shown on Trial Exhibit 5 are different from those argued by the bank in the state court lawsuit because the bank had previously calculated interest on a 360-day post-maturity rate in accordance with the Note, which went above the 24% maximum interest rate allowed by the State of Tennessee.  The interest was subsequently accurately recalculated for the Involuntary Petition.  Additionally, in the original Involuntary Petition, Tennessee State Bank listed the amount of its claim as $7,394,727.11 which is the collective amount owed by the Debtor and Gerald L. Miller.  This amount was, likewise, subsequently amended to the $1,159,089.32 shown on the Amended Involuntary Petition filed on February 4, 2013.  Irrespective that the Debtor disputes some of the amounts owed to Tennessee State Bank, she does not dispute that she owes the underlying obligation for each Note.  The court has previously rejected the argument that "post-BAPCPA § 303(b) requires an all-or-nothing analysis: that the statutory language 'as to liability or amount' should be read as meaning that any dispute as to any portion of the amount of a claim owed disqualifies a creditor from being a petitioning creditor."  *In re Miller*, No. 12-33942, slip op. at 9 (Bankr. E.D. Tenn. Jan. 9, 2013).  The same applies with respect to the Debtor in this involuntary bankruptcy case.

**B**

The Debtor also argues that the McGinnises are secured creditors and thus, ineligible to join in the Involuntary Petition.  As previously stated, under § 303(b)(1), there must be at least three or more unsecured claimants filing the petition, and although secured creditors may be a petitioning creditor if there are other petitioning creditors whose unsecured claims total more than the minimum amount for such claims, such is not the case when the involuntary petition has previously been commenced.  "The general rule is that fully and partially secured creditors can be petitioning creditors[; however,] the other petitioning creditors' noncontingent, undisputed, unsecured claims must aggregate at least $14,425.  . . . .  Further, the use of the word 'aggregate' in section 303(b) applies only to the creditors commencing the case; fully secured creditors are still entitled to be counted to determine the debtor's total number of creditors."   2 COLLIER ON BANKRUPTCY ¶ 303.12[2] (16th ed. 2011).

Once an involuntary petition has been filed, joinder of creditors is accomplished through subsection (c), which states that "[a]fter the filing of a petition under this section but before the case is dismissed or relief is ordered, a creditor holding an unsecured claim that is not contingent, other than a creditor filing under subsection (b) of this section, may join in the petition with the same effect as if such joining creditor were a petitioning creditor under subsection (b) of this section." 11 U.S.C. § 303(c).  The language of subsection (c) is clear; only unsecured creditors are authorized to join in a previously-filed petition.  *See* 2 COLLIER ON BANKRUPTCY ¶ 303.19[1] (16th ed. 2011) ("Creditors eligible to join are those that were not petitioning creditors under section 303(b) and who hold unsecured claims that are not contingent."); *see also* 2 COLLIER ON BANKRUPTCY ¶ 303.12[2]

14

("The permissibility of secured creditors serving as petitioning creditors is reinforced by the language in section 303(c) that specifically provides that only creditors 'holding an *unsecured* claim' may join in a petition.") (emphasis in original).

As set forth in the Joinder or Intervention by Additional Petitioning Creditor filed by each of the McGinnises on November 8, 2012, their claim arises under a Stock and Asset Purchase Agreement dated July 23, 2008, between the McGinnises and "Gerald L. Miller et ux. Karen L. Miller" for the purchase by the Millers of the McGinnises' interest in Cove Mountain Realty, Inc. in the amount of $600,000.00. TRIAL EX. 15. The Stock and Asset Purchase Agreement was secured by a Deed of Trust dated October 31, 2008, and executed by Gerald L. Miller and the Debtor, whereby they agreed to be jointly indebted to the McGinnises for $425,000.00 and pledged as collateral real property "conveyed to Gerald L. Miller and Charles A. McGinnis by General Warranty Deed from T. Dudley Perry dated June 1, 1993 and of record in Book 500 at Page 121 in the Register's Office for Sevier County, Tennessee." TRIAL EX. 14. Pursuant to the testimony of Mr. McGinnis, the last payment the McGinnises received from the Debtor was in the amount of $12,500.00 in January 2011, and there is an outstanding balance of $112,500.00.

The Debtor argues that the McGinnises' claim is secured by a deed of trust and although they claim to be undersecured, the record reflects no proven property values to support that contention. However, as acknowledged by the Debtor during her testimony, she does not have any ownership interest in the real property pledged in the Deed of Trust which secures the Stock and Asset Purchase Agreement. This real property was conveyed to Gerald L. Miller by Quit Claim Deed dated October 29, 2008, and was recorded on November 5, 2008, in Book 3215, at Page 328, TRIAL

15

Ex. 51, prior to the Deed of Trust between the McGinnises and the Millers, which was recorded in

Book 3215, at Page 331. TRIAL EX. 14. Accordingly, although the Deed of Trust was executed by

the Debtor and provides that the real property pledged therein is security for the Stock and Asset

Purchase Agreement, only Gerald L. Miller is an owner of that real property, which had previously

been pledged to Tennessee State Bank by virtue of the Deed of Trust dated October 26, 1998, and

recorded on November 10, 1998, in Book T737 at Page 598. TRIAL EX. 13. Based upon the cross-

collateralization provisions in the thirteen notes executed by Gerald L. Miller, this real property

serves as collateral for the balance of those notes, totaling $7,394,727.11, and is first in priority as

between Tennessee State Bank and the McGinnises. The unrefuted testimony of Mr. McGinnis is

that he has not attempted to enforce the Deed of Trust because the real property has no value above

Tennessee State Bank's lien. As such, the McGinnises are unsecured creditors of the Debtor to the

extent of their $112,500.00 claim.

## C

The Debtor finally argues that the Involuntary Petition should be dismissed because, with

the exception of her obligation to Tennessee State Bank, she has generally paid her debts as they

have become due. The burden of proof that a debtor is not generally paying its debts falls upon its

petitioning creditors, *In re Brooklyn Res. Recovery, Inc.*, 216 B.R. 470, 482 (Bankr. E.D.N.Y. 1997),

and "'requires a more general showing of the debtor's financial condition and debt structure than

merely establishing the existence of a few unpaid debts.'" *Liberty Tool & Mfg., Inc. v. Vortex

Fishing Sys., Inc. (In re Vortex Fishing Sys., Inc.)*, 277 F.3d 1057, 1072 (9th Cir. 2002) (quoting

*Semel v. Dill (In re Dill)*, 731 F.2d 629, 632 (9th Cir. 1984)). "The bankruptcy court considers the

16

proportion of the debt being paid – both in terms of the proportion of creditors being paid and the proportion of debt, in dollar value, being paid[,]" *Concrete Pumping Serv., Inc. v. King Constr. Co., Inc.*, 943 F.2d 627, 630 (6th Cir. 1991) (citations omitted), and includes "creditors who are not currently pressing the alleged debtor for payment, if their debts have become due." *In re Smith*, 415 B.R. 222, 231 (Bankr. N.D. Tex. 2009). Nevertheless, "[w]here a debtor fails to pay even one debt that makes up a substantial portion of its overall liability, a court may find that [it] is generally not paying [its] debts." *In re Amanat*, 321 B.R. 30, 39-40 (Bankr. S.D.N.Y. 2005).

> In the final analysis, the determination whether an alleged debtor is generally not paying his or her debts as they become due is a flexible one which admits "no hard and fast rules," *In re Einhorn*, 59 B.R. 179, 185 (Bankr. E.D.N.Y. 1986), and requires a careful balancing of both the number and amount of the unpaid debts, in proportional terms, viewed in the light of the alleged debtor's total financial picture. Courts that have undertaken this analysis have identified the following four factors as guideposts in their inquiry: (1) the number of unpaid claims; (2) the amount of such claims; (3) the materiality of the nonpayments; and (4) the debtor's overall conduct of its financial affairs.

*Crown Heights Jewish Cmty. Council, Inc. v. Fischer (In re Fischer)*, 202 B.R. 341, 350 (E.D.N.Y. 1996) (citations omitted). "Although the test is one of the totality of the circumstances and there is no strict requirement for a court to address each and every factor, most courts addressing this question rely heavily on the number and amount of the unpaid claims and compare those values with the debts the debtor is paying." *Murrin v. Hanson (In re Murrin)*, 477 B.R. 99, 107 (Bankr. D. Minn. 2012).

The record reflects that the Debtor has not paid her obligations to any of the petitioning creditors. Ms. Spurgeon testified that when she was making payments on the Notes, the Debtor often paid late but they were nevertheless being paid. However, the last payments received by Tennessee State Bank from the Debtor were as follows: (1) loan no. xxxx5233, on July 5, 2011 for

17

the June 12, 2011 payment; (2) loan no. xxxx8790, on June 23, 2011 for the June 4, 2011 payment;

(3) loan no. xxxx0637 on June 16, 2011 for the May 30, 2011 payment; and (4) loan no. xxxx2385

on June 16, 2011 for the May 30, 2011 payment.  In his deposition, Mr. Housholder testified that

June 16, 2011, was the last time he received a lease payment from either the Debtor or Gerald L.

Miller, TRIAL EX. 16 at 12, lines 19-22, and in her deposition, Mrs. Housholder testified that the

Millers' payments between 2004 and 2010 were often slow.  TRIAL EX. 17 at 4, lines 21-24.  Finally,

Mr. McGinnis testified that the last payment he had received from the Debtor, in the amount of

$12,500.00, was received in January 2011, and that $112,500.00 was still owing.  The record also

reflects that, although they have since been paid, the Debtor and Gerald L. Miller have been

delinquent on payments in the past to the Internal Revenue Service and to the Sevier County Tax

Assessor.

   In opposition to the averment that she is not generally paying her debts as they become due,

the Debtor provided a summary of her household bills and payments thereon.  Of those included

within the summary and/or listed on Exhibit A to her Amended Answer to Involuntary Petition, the

Debtor testified that although she was not paying Tennessee State Bank, the McGinnises, or the

Housholder Family Trust, she was current on her payments to the rest of her creditors, including

Indy Mac Mortgage, Florida Power & Light, Sevier County Utility District, Sevier County Electric,

South Carolina Electric & Gas, West Carolina Telephone, Citibank Visa, Verizon, the City of

Sevierville, Erie Insurance, Holishor Association, James Markey, McCormick County Sewer &

Water, Port Orange Utility, and Riverplace Condo Homeowners.  According to her testimony and

with the exception of the petitioning creditors, as of the petition date, the Debtor owed money to

only a few of those included on her List of Creditors: Indy Mac Mortgage, Sevier County Utility

District, and Citibank Visa. Obligations to taxing authorities had not yet become due, insurance premiums had been paid and were not yet ready to be renewed, and utility bills had been paid for the previous month. As she testified, her household bills were current and being paid timely. Nevertheless, the majority of the debts owed by the Debtor to her various creditors is owed to the petitioning creditors, who the Debtor testified she is not paying. The Debtor, as of September 28, 2012, the date the Involuntary Petition was filed, owed $1,106,849.19 to Tennessee State Bank, which she stopped paying in July 2011. The Debtor owes, at a minimum, $420,000.00 to the Housholder Family Trust, which she also stopped paying in July 2011. *See* COLL. TRIAL EX. 33. Finally, the Debtor owes $112,500.00 to the McGinnises, which the Debtor stopped paying in January 2011. Furthermore, it was only after the Debtor stopped making payments to Tennessee State Bank that it accelerated the Notes, giving rise to the claims she made in the lawsuit she filed in Sevier County.

Because she is not paying what amounts to the majority of her outstanding debts and she has, in the past, exhibited a lackadaisical attitude towards her obligations, including late payments to the Sevier County taxing authorities and nonpayment to the Internal Revenue Service resulting in the imposition of tax liens, the court finds that the Debtor is generally not paying her debts as they become due. Because she also has three or more creditors, each of which is the holder of a claim against her that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount, and such noncontingent, undisputed claims aggregate at least $14,425.00 more than the value of any lien on property of the Debtor securing such claims held by the petitioning creditors, the Involuntary Petition will be sustained and an order for relief will be entered against the Debtor under Chapter 7.

19

An Order consistent with this Memorandum will be entered.

FILED:  March 14, 2013

BY THE COURT

*/s/  RICHARD STAIR, JR.*

RICHARD STAIR, JR.
UNITED STATES BANKRUPTCY JUDGE