## IN THE UNITED STATES BANKRUPTCY COURT FOR THE
### EASTERN DISTRICT OF TENNESSEE

In re

                                                    Case No.   12-33943

KAREN L. MILLER

                    Debtor


## MEMORANDUM ON
## THIRD AMENDED PLAN OF REORGANIZATION


**APPEARANCES**:    HALE, LYLE & RUSSELL
                    Mary Foil Russell, Esq.
                    Post Office Box 274
                    Bristol, Tennessee 37621
                    Attorneys for Debtor

                    GENTRY, TIPTON & MCLEMORE, PC
                    Maurice K. Guinn, Esq.
                    Post Office Box 1990
                    Knoxville, Tennessee 37901
                    Attorneys for Tennessee State Bank

                    SAMUEL K. CROCKER, ESQ.
                    UNITED STATES TRUSTEE
                    Kimberly C. Swafford, Esq.
                    Howard H. Baker, Jr. United States Courthouse
                    800 Market Street
                    Suite 114
                    Knoxville, Tennessee  37902
                    Attorneys for United States Trustee


**SUZANNE H. BAUKNIGHT**
**UNITED STATES BANKRUPTCY JUDGE**

Before the court is confirmation of the Plan of Reorganization initially filed by Debtor on

December 23, 2013, and amended most recently by the Third Plan of Reorganization Dated

January 30, 2015 (Third Amended Plan), and the Objection of Tennessee State Bank to Second

Plan of Reorganization filed on September 11, 2014.  The trial to consider confirmation of the

Third Amended Plan was held on March 24, 2015.  The record before the court consists of fifty-

seven exhibits introduced into evidence at trial; one post-trial supplemental exhibit submitted by

Debtor on April 6, 2015; Stipulations filed by the parties on February 3, 2015; and the testimony

of three witnesses: Darryl Roberts, Shelley Spurgeon, and Debtor.  This is a core proceeding.  28

U.S.C. § 157(b)(2)(L).

## I.  FACTS

On September 28, 2012, Tennessee State Bank[1] filed an Involuntary Petition against

Debtor and a separate Involuntary Petition commencing bankruptcy case no. 12-33942 against

Debtor's husband, Gerald Lloyd Miller.[2]  After Debtor answered, the court entered an Order that

sustained the Involuntary Petition and granted Chapter 7 relief against Debtor on March 14,

2013.  The case subsequently was converted from Chapter 7 to Chapter 11 on Debtor's motion

by an order entered March 28, 2013.

As of the petition date, the Millers were jointly indebted to the Bank under the following,

each of which is secured by a corresponding deed of trust:  (1) Ethel Headrick/Campground

Office Note in the amount of $123,750.00, dated October 31, 2008; (2) Happy Hollow Road

Note in the amount of $68,000.00, dated December 10, 2008; (3) Parkway Properties Note in the

amount of $548,059.83, dated August 4, 2009; and (4) Valley Mart Exxon Note in the amount of

---

[1] Any references to "the Bank" will likewise mean Tennessee State Bank.

[2] All references in this Memorandum to "Miller" will refer solely to Gerald Miller.  Karen Miller will be referred to as "Debtor."  Any references to "the Millers" will be to Gerald and Karen Miller together.

1

$146,416.24, dated November 12, 2010.  Tennessee State Bank filed proofs of claim in Debtor's

case for each obligation.  [*See* Trial Exs. 1-4.]  In addition, Miller was indebted to the Bank

under nine other notes, either individually or as a tenant-in-common with others.  [Trial Ex. 55;

Doc. 424 at ¶ 16.]  One of the nine other notes concerned property known as Thunder Mountain,

for which the note loan amount was $2,880,000.00, dated November 10, 2010.

On September 23, 2014, the court entered the Order Confirming Chapter 11 Plan in

Miller's case (the Confirmed Plan) which contains, *inter alia*, the following relevant provisions

pertaining to treatment of classes:

> Class 3b – Class 3b consists of property taxes owed to Sevier County, Tennessee
> that were incurred before the commencement of the case and last payable without
> penalty after one year before the Petition Date.  These property taxes were
> incurred in 2012.  Included in this class is one-half of the property tax attributable
> to properties owned by the Debtor jointly with others and the full amount of
> properties owned solely by the Debtor.  The one-half of these taxes not paid
> through this Plan will be paid by the joint owners including the Debtor's wife,
> Karen Miller, in her bankruptcy case, Chapter 11 No. 12-33943.  This class totals
> $22,424.91, which consists of $16,122.50 in tax and $6,302.41 in penalties and
> interest.  This class will be paid in full within 60 days of the effective date of the
> Plan from the sale of unencumbered property as explained below.  This class is
> unimpaired.

> Class 3c – Class 3c consists of one-half of the prepetition property taxes owed to
> Sevier County, Tennessee not included in Class 3b on two properties owned by
> the Debtor and his wife as tenants by the entireties.  These property taxes were
> incurred in the years 2009 through 2011.  These properties include the shopping
> center located at 335 Wears Valley Road, Pigeon Forge and a 74.39 acre parcel
> located at 1441 Little Cove Road (also known as Thunder Mountain).  The one-
> half of these taxes not paid through this Plan will be paid by the Debtor's wife,
> Karen Miller, in her bankruptcy case, Chapter 11 No. 12-33943.  This class totals
> $19,114.89, which consists of $11,371.00 in tax and $7,743.89 in penalties and
> interest.  This class will be paid in full within 60 days of the effective date of the
> Plan from the sale of unencumbered property as explained below.  This class will
> be paid in full on the effective date [*sic*] of the Plan.  This class is unimpaired.

> Class 3d – Class 3d consists of prepetition secured property taxes owed to Sevier
> County, Tennessee that are not included in Classes 3b or 3c.  Included in this case
> is one-half of the property tax attributable to properties owned by the Debtor
> jointly with others and the full amount of properties owned solely by the Debtor.

These property taxes were incurred in 2009 through 2011 on properties that will be sold to fund this Plan.  The one-half of these taxes not paid through this Plan will be paid by the joint owners including the Debtor's wife, Karen Miller, in her bankruptcy case, Chapter 11 No. 12-33943.  This class totals $41,706.63, which consists of $23,939.50 in tax and $17,767.13 in penalties and interest.  This class will be paid in full from sales proceeds of the properties as they are sold.  This class is unimpaired.

Class 4 – Class 4a, 4b, 4c and 4d consist of the thirteen claims filed by TSB.  By Order of the Bankruptcy Court dated September 9, 2014, the claims have been segregated into the following separated Classes based upon ownership of the collateral securing the claims.  In total, all of the claims are secured by real property and each of the thirteen deeds of trust provides that the property for that deed of trust also secures any other debts owned by the Debtor to TSB.  Because of the cross collateralization provisions, all claims are secured by all of the property.  The thirteen claims total $7,294,727.13 as of the petition date.  The total value of the collateral, and therefore the value of the secured portion of TSB's claims is $4,756,000.00.  The deficiency is therefore $2,538,727.13 plus the amount of real estate taxes and expenses of sales that are paid from proceeds from sales.  The unsecured portion of TSB's claims shall be treated in Class 7 as an unsecured claim.  The Debtor reserves the right to object to TSB's claims within 60 days of the Effective Date of the Plan.

Class 4a – Class 4a consists of the secured portion of three claims filed by Tennessee State Bank that are secured by real property owned by the Debtor and his wife as tenants by the entireties.  These are Claim Nos. 1, 2 and 5.

. . . .

*The property securing Claim Nos. 1, 2 and 6 [sic] was appraised in the aggregate with a value of $1,000,000.00.  The total of the three claims is $838,185.49.  Therefore, the total surplus for these three claims as of the petition date is $161,814.51.

TSB will retain the liens that secure its claims in this class.  The Debtor will sell all of the properties that secure TSB's claims free and clear of liens, with TSB's liens attaching to the sales proceeds, and will pay to TSB the sales proceeds after expenses of the sale and payment of real estate taxes.  The property will be sold through the assistance of licensed realtors whose employment has been authorized by the Court.  For any property that has not been sold by the expiration of 18 months after the Effective Date of the Plan, the automatic stay shall be automatically modified to allow TSB to assert its state law rights to its collateral, including foreclosure.  This class is impaired.

. . . .

<u>Class 4d</u> – Class 4d consists of the secured portion of two claims filed by Tennessee State Bank that are secured by leasehold estates owned by the Debtor and his wife as tenants by the entireties. These are Claim Nos. 7 and 13.

. . . .

TSB will retain the liens that secure its claims in this class. The Debtor will sell all of the properties that secure TSB's claims free and clear of liens, with TSB's liens attaching to the sales proceeds, and will pay to TSB the sales proceeds after expenses of the sale and payment of real estate taxes. The property will be sold through the assistance of licensed realtors whose employment has been authorized by the Court. For any property that has not been sold by the expiration of 18 months after the Effective Date of the Plan, the automatic stay shall be automatically modified to allow TSB to assert its state law rights to its collateral, including foreclosure. If the Debtor and TSB do not agree on the allocation of any sales proceeds, the Court shall resolve the dispute after notice and a hearing. This class is impaired.

. . . .

<u>Class 7</u> – This class consists of the following general unsecured claims: . . . Tennessee State Bank deficiency claim $2,538,727.13 . . . .

TSB's unsecured claim will be higher because the amount disclosed above does not take into account expenses of sales of its collateral or payments of property taxes from proceeds of the sales. Therefore, if the Debtor and TSB are unable to agree on the amount of its unsecured claim, TSB may amend its claim, and the Court will resolve any disputes upon notice and hearing.

This class will be paid the residue of the sales proceeds of the Debtor's unencumbered property as explained below after the payment of Classes 1, 3b and 3c. The Debtor is unable to estimate the percentage recovery by Class 7 creditors because of the uncertainty of sales prices for the auction of property owned as a tenant by the entireties. . . . Additionally, the Debtor will pay his projected disposable income to this class on a pro rata basis, with payments being made quarterly for a period of five years. This class is impaired.

[Trial Ex. 7 at pp. 5-9, 11.]

On November 25, 2014, the court entered an agreed order authorizing sale of the Valley

Mart Exxon Leasehold interest, which sale closed on January 21, 2015. Proceeds from the sale

totaling $465,000.00 were paid to Tennessee State Bank, which intends to apply the proceeds as

follows: $162,074.76 to the Valley Mart Exxon loan payoff "at contract note rate" as of January

21, 2015; pre-petition, pro-rated attorneys' fees of $3,815.58 and pre-petition interest of

$37,083.16 (both of which pre-petition amounts are included in the Bank's proof of claim

number 4); post-petition attorneys' fees of $20,225.03; and post-petition interest at the default

rate totaling $74,360.00.  [Trial Ex. 38.]  Subject to approval of the court, the Bank has applied

the remaining proceeds of $167,441.47 towards principal reduction of the Thunder Mountain

property note on which only Miller is obligated.  Application of the excess proceeds from the

Valley Mart Exxon Leasehold sale are at the heart of the Bank's objection to confirmation in this

case.

Debtor filed a Plan of Reorganization and Disclosure Statement on December 23, 2013,

both of which were amended on February 17, 2014,[3] and again on July 11, 2014.[4]  Debtor's

Third Amended Plan filed on January 30, 2015, is the plan presently before the court on

confirmation and contains the following treatment of creditors:

- Class I consists of administrative claims.  Class IA includes professional fees and expenses.
  Class IB includes fees payable to the United States Trustee.  Class IC includes post-petition
  trade payables and administrative expenses.  Class ID includes post-petition taxes owed to
  Sevier County, Tennessee.

- Class II consists of priority and secured tax claims.  Class IIA represents the amended claims
  of the Internal Revenue Service in the amount of $1,499.64, to be paid on the Effective Date.
  Class IIB represents the claims of the Tennessee Department of Revenue in the amount of
  $621.74, to be paid on the Effective Date.  Class IIC represents property taxes owed by
  Debtor jointly with Mr. Miller to Sevier County, Tennessee, incurred pre-petition in the
  amount of $12,808.00 to be paid on the Effective Date or in no more than sixty monthly
  payments of $241.70 including 5% interest, with any deficiency remaining on properties that
  are sold to be paid at the respective closings.  Class IID represents taxes owed by Debtor

---

[3] Debtor filed a Report of Balloting for the First Amended Plan on March 31, 2014, evidencing that no ballots were
received for Classes II, III, V, and IX; that Classes IV and VIII rejected the plan; that Class VII accepted the plan;
and that Class X had one accepting ballot and one rejecting ballot received.

[4] The court entered an Order approving the second amended disclosure statement on August 8, 2014, and Debtor
filed a Report of Balloting on September 16, 2014, reflecting that no ballots were received by Classes II, III, VI, IX,
or X; that Classes IV and VIII rejected the plan; and that Classes V and VII accepted the plan.  Tennessee State
Bank and the United States Trustee filed objections to confirmation on September 11, 2014; however, Debtor filed
an Amended Second Plan of Reorganization on September 25, 2014, after which the United States Trustee withdrew
his objection.

jointly with Mr. Miller to the Sevier County Clerk & Master to be paid as properties are sold, with any deficiencies on properties that are sold to be paid in the respective closings, although Debtor will pay one-half of the $11,371.00 owed on the commercial shopping center and unimproved Little Cove Road properties on the Effective Date or in no more than sixty monthly payments of $214.58 including 5% interest.

- Class III consists of OneWest Bank's secured claim, assigned by IndyMac Mortgage Services, in the amount of $211,124.15 as of October 3, 2013, secured by real property located at 5765 Pendelbury Court, Port Orange, Florida.  OneWest Bank is receiving a monthly maintenance payment of $2,153.72 (including 7.5% interest), subject to any adjustments for escrowed taxes and insurance, pursuant to the Agreed Order Granting Motion of Debtor for Authority to Provide Principal Residence Maintenance Payments to OneWest Bank entered on October 22, 2013.

- Class IV consists of Tennessee State Bank's claims.  Class IV-A represents the claims secured by leasehold interests:  (1) the Valley Mart Exxon claim in the amount of $175,903.40 and (2) the Parkway Property claim in the amount of $714,749.72.  On January 21, 2015, Debtor sold the Valley Mart Exxon Leasehold, with the $465,000.00 proceeds paid at closing to Tennessee State Bank to be held pending a court order concerning allocation of proceeds in excess of the payoff, which Debtor proposes to apply towards the Parkway Property claim. Debtor proposes to sell the Parkway Property leasehold interest free and clear of liens with sale proceeds, after taxes, commissions, and expenses of sale, to be paid to Tennessee State Bank.  Until the Parkway Property is sold, Debtor will pay $1,262.56 monthly.  Debtor will be responsible for obtaining a new subtenant for making lease payments in the event its subtenant, Stokely Hospitality Enterprises, defaults.  Class IV-B represents the claims secured by properties owned jointly with Mr. Miller as tenants by the entireties:  (1) the Campground Office Property claim in the amount of $145,613.53 and (2) the Happy Hollow Road Property claim in the amount of $85,846.87, both of which Debtor proposes to market for sale individually and together, free and clear of liens, with all proceeds, after taxes, commissions, and expenses of sale, to be paid to Tennessee State Bank. With respect to all Class IV claims, Debtor will market for sale all properties for twenty-four months following the Effective Date.  In the event a commercially reasonable sale is not achieved, the automatic stay will be terminated, and Tennessee State Bank may assert its state law rights against the properties, including foreclosure.  Over the twenty-four months, Debtor will maintain current insurance and pay property taxes, with any failure to do so triggering default provisions allowing Tennessee State Bank to notify Debtor in writing within fifteen days, after which Debtor has twenty days to cure the default.  Any disputes with taxing authorities must be cured by Debtor, and Tennessee State Bank will retain its liens until the collateral is disposed of.

- Class V includes the disputed, unsecured claim of Charles and Melanie McGinnis in the amount of $112,500.00, which will be settled in exchange for release of the non-compete clause in the Purchase Agreement between Debtor and Mr. Miller and the McGinnises for their interest in Cove Mountain Realty.

- Class VI includes the disputed claim of Robert C. and Ida N. Glenn in an unknown amount, for which Debtor proposes to pay $1,500.00 in full and final settlement on the Effective Date.

- Class VII includes unsecured, non-priority claims in the aggregate amount of $2,713.25, representing $2,281.45 to Mike Tranum, $31.80 to the Tennessee Department of Revenue, and $400.00 to Citibank Visa, to be paid 100% in a lump-sum payment on the Effective Date.

- Class VIII includes Tennessee State Bank's unsecured, non-priority claim to the extent that sale of the collateral does not pay Tennessee State Bank's secured claims in full, which unsecured claim will be paid by Debtor through the sale of unencumbered assets or use of disposable income.

- Class IX includes unsecured disputed, unliquidated, or contingent claimants who have not filed a proof of claim. Debtor may file objections to any such claims, and this class may be paid upon agreement or settlement between Debtor and claimants or through litigation.

- Class X includes executory contracts and leases. As provided in various court orders, Debtor has assumed leases with Calloway Oil Company; Amita, Inc.; Frank Perry; Subway/Valley Mart; Subway/Movieland; Keith and Jane Medlin; James Householder; and Marceil Peery. All other executory contracts and leases will be rejected, and any claim arising from a rejected executory contract or lease will be barred unless a proof of claim is filed on or before the Effective Date.

- Class XI includes Debtor, who will receive a discharge under 11 U.S.C. § 1141(d)(5) upon completion of payments as provided for under the plan.

The Third Amended Plan also contains the following Additional Provisions concerning the

Bank's classes relevant to the issues before the court:

1. The TSB properties will be offered for sale through the commercial real estate agent approved by the Court for listing on commercial real estate listing websites and through such other marketing efforts as recommended by the listing agent. Debtor will market the properties for a sales period of 24 months from confirmation.

2. Debtor intends to accept only an offer that reflects a commercially reasonable price for the property and on commercially reasonable terms. If binding contracts for the sale of the property are not executed within 24 months after the Effective Date of the Plan, then the automatic stay shall be automatically modified to allow TSB to assert its state law rights to its collateral, including foreclosure.

. . . .

7

6.    With regard to sale of any TSB property, Debtor shall not cause any postponement or delay in sale or closing on such property or in payoff to TSB of its loan balance on such property based upon the Debtor's treatment in the Plan of back property taxes under Class IIC and IID.  In the event that a property tax dispute arises at the time of sale for any TSB property, that is[,] that the taxing authority claims after Plan confirmation that the Authority is entitled to a rate of interest on back tax claims for more than is provided in the Plan, Debtor shall either make up the difference in tax amount from disposable income or other funds or place the tax differential amount into escrow and allow the Court to rule upon said claim.  In no event shall a dispute with a taxing authority result in a delay of sale or in reduction in the amount to be paid to TSB.

7.  TSB will retain the liens that secure its claims.  The Debtor will sell all of the properties that secured TSB's claims free and clear of liens, with TSB's liens attaching to the sale proceeds to the extent allowed by 11 U.S.C. §506(b), and will pay to TSB the sales proceeds after expenses of the sale and payment of real estate taxes.  The lien or encumbrance will continue to be held by creditor under 11 U.S.C. §1124(2) and 11 U.S.C. §1129(b)(2)(A) to the extent of the value of the collateral.

[Trial Ex. 34 at pp. 8-9.]

As set forth in the Joint Pretrial Statement filed by the parties on February 3, 2015, the court will determine the following issues:  (1) whether the surplus proceeds from the sale of the Valley Mart Exxon Leasehold are to be applied to Tennessee State Bank's loan secured by the Parkway Property Leasehold as proposed by Debtor; (2) whether the Bank may apply surplus proceeds from the sale of the Valley Mart Exxon Leasehold to an indebtedness for which Mr. Miller alone is liable; (3) whether the Bank has an unsecured claim; (4) whether the Third Amended Plan complies with 11 U.S.C. § 1129(a)(7) with respect to the claims of the Bank and the Sevier County Clerk & Master; (5) whether the Bank has standing to challenge Debtor's proposed treatment of Sevier County's claims; (6) whether the proposed treatment of the Bank's claims is fair and equitable as required by 11 U.S.C. § 1129(b).[5]

---

[5] The Joint Statement refers to "Valley Market Exxon;" however, the record clearly indicates that the property is the Valley Mart Exxon Leasehold.

## II. ANALYSIS

Confirmation of Chapter 11 plans is governed by 11 U.S.C. § 1129, which provides, in material part, the following:

(a) The court shall confirm a plan only if all of the following requirements are met:

. . .

(7) With respect to each impaired class of claims or interests –

(A) each holder of a claim or interest of each class –

(i) has accepted the plan; or

(ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date . . . .

(b)      (1) Notwithstanding section 510 of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides –

(i)      (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

9

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.

## A. APPLICATION OF SURPLUS PROCEEDS

Tennessee State Bank has argued that the dragnet clause in the Valley Mart Exxon Leasehold Deed of Trust (Leasehold Deed of Trust) allows the Bank to apply the $278,884.63 surplus proceeds received from the sale of the Valley Mart Exxon Leasehold towards the Thunder Mountain debt, an indebtedness owed solely by Miller, because the Leasehold Deed of Trust was executed by the Millers allowing for cross-collateralization of all outstanding and future indebtedness. Consequently, the Bank argued, it is not required, as proposed by Debtor's plan, to apply the surplus proceeds towards payment of the Millers' joint debt on the Parkway Property Note.

On the other side, Debtor argued that she should be allowed to use and the Bank should be required to apply the entire excess proceeds from the Valley Mart Exxon Leasehold sale to one of the debts owed by the Millers jointly. She acknowledged that the Leasehold Deed of Trust contains a cross-collateralization provision but argued that allowing allocation to a debt owed solely to Miller would create a deficiency balance or increase balances on the joint debt, forcing Debtor to use more of her sole unencumbered assets to pay the deficiency. She also argued that she did not intend for the dragnet clause in the Leasehold Deed of Trust to secure Miller's individual debts to the Bank and that, under Tennessee law, sale proceeds of property owned as tenants by the entirety must be applied to joint debts because the proceeds retain their

character as entireties property.  Debtor additionally argued that because Miller was creditworthy when he obtained the Thunder Mountain debt, any attempt by the Bank to apply joint proceeds to Miller's individual debt would violate the Equal Credit Opportunity Act.  Finally, Debtor argued that the proceeds must be applied in accordance with principles of equity.

Based upon the record and governing law, the court agrees with the Bank that, pursuant to the dragnet clause contained in the Leasehold Deed of Trust, the Bank may apply the excess proceeds from the Valley Mart Exxon Leasehold sale to any debt owed to it by either of the Millers, rendering the contrary portion of Debtor's proposed plan unconfirmable.

### 1.  TENANTS BY THE ENTIRETY AND THE DRAGNET CLAUSE

Debtor is correct, and the Bank does not dispute, that Debtor and Miller held the Valley Mart Exxon Leasehold interest as tenants by the entirety.  Under Tennessee law, there is a rebuttable presumption that all property acquired during a marriage is held by the husband and wife as tenants by the entirety, *see In re Garbett*, 410 B.R. 280, 286 (Bankr. E.D. Tenn. 2009), and "it is generally held that in the absence of an agreement or understanding to the contrary, when a tenancy by the entirety is conveyed, the proceeds are held in the same manner, that is, by the entirety." *White v. Watson*, 571 S.W.2d 493, 495 (Tenn. Ct. App. 1978).  Accordingly, Debtor has correctly asserted that because the Valley Mart Exxon Leasehold interest was held by the Millers as tenants by the entirety, under Tennessee law, the proceeds retain the same character.  Nevertheless, "[t]he existence of a tenancy by entireties is a question purely of intention, though an intention on the part of the grantor to create such a tenancy is presumed, in the absence of an expression of a contrary intention." *Myers v. Conner*, 234 S.W. 325, 326 (Tenn. 1921).

11

The court finds that under the terms of the Leasehold Deed of Trust, Debtor and Miller contractually altered their rights to claim that any sale proceeds from the Valley Mart Exxon Leasehold would be entitled to the protections of tenancy by the entirety.  The result of such contractual alteration of rights is that the collateral of the Leasehold Deed of Trust serves as security for the repayment of any current or future debt by either of them.  A tenancy by the entirety is subject to severance "whether by divorce or other action of the parties."  *Finch v. Tenn. Farmers Mut. Ins. Co.*, 1997 WL 92073, at *9, 1997 Tenn. App. LEXIS 146, at *25 (Tenn. Ct. App. Mar. 5, 1997) (quoting *St. Paul Fire & Marine Ins. Co. v. Malloy*, 433 A.2d 1135, 1142 (Md. 1981)).  Here, the Millers executed the Leasehold Deed of Trust providing, in material part, that it serves as security for the following:

> (a) repayment of the indebtedness evidenced by a certain promissory note made by Gerald L. Miller and wife, Karen L. Miller (sometimes hereinafter referred to as "Borrower") dated 10-17-00 (herein "Note"), in the sum of Three Hundred Forty Thousand and 00/100 Dollars ($340,000.00), with principal and interest payable as provided in said Note and with the balance of the indebtedness, if not sooner paid, due and payable on 10-17-2005, together with all renewals, modifications, and extensions of said indebtedness; (b) the payment of all other sums advanced in accordance herewith to protect the security of this Deed of Trust together with interest and charges thereon; (c) the performance of the covenants and agreements herein contained; ***(d) the payment of any and all other indebtedness, whether direct or indirect, now or hereafter owing to Lender by Borrower, or by any individual or entity included in the term Borrower, regardless of the type, class, or purpose of any such other indebtedness, and however such indebtedness is evidenced, including, without limitation, the repayment of any Future Advances made by Lender pursuant to paragraph 20 of this instrument (herein "Future Advances"), together with interest thereon.*** All of the above shall be hereinafter referred to collectively as the "Indebtedness."
>
> . . . .
>
> 5.     APPLICATION OF PAYMENTS.  Payments received by Lender under the Note and this Deed of Trust shall be applied to principal and interest on the note and to all other sums secured by this Deed of Trust in such order and manner as are determined by Lender in its sole discretion, subject only to the provisions of this Instrument.

. . . .

20.   PRIORITY OF THIS DEED OF TRUST; FUTURE ADVANCES; EXTENSIONS; MODIFICATIONS AND RENEWALS.   Any portion of the Indebtedness which is incurred after the execution of this Deed of Trust pursuant to any loan agreement including this Deed of Trust, or which is evidenced by any instrument stating that said Indebtedness is secured by this Deed of Trust, shall be defined as a Future Advance.   This paragraph shall serve as notice to any subsequent encumbrancers of the Property that Lender claims the priority of the lien of this Deed of Trust for all such Future Advances, as well as for all other obligations secured thereby.   This paragraph shall also be notice that Lender reserves the right to modify, extend, consolidate, and renew the Indebtedness, or any portion thereof, and the rate of interest charged thereon, without affecting the priority of the lien created by this Deed of Trust.

[Trial Ex. 2 at p. 9-11 (emphasis added).]

"A cardinal rule of contractual interpretation is to ascertain and give effect to the intent of the parties.  Courts must look at the plain meaning of the words in a contract to determine the parties' intent." *Allmand v. Pavletic*, 292 S.W.3d 618, 630 (Tenn. 2009).

"The intent of the parties is presumed to be that specifically expressed in the body of the contract." *Planters Gin Co.* [*v. Fed'l Compress & Warehouse Co., Inc.*], 78 S.W.3d [885], 890 [(Tenn. 2002)].   Therefore, the court's role in resolving disputes regarding the interpretation of a contract is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the language used. *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999); *Bob Pearsall Motors, Inc. v. Regal Chrysler–Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975).   Where the language of the contract is clear and unambiguous, its literal meaning controls the outcome of contract disputes. *Planters Gin Co.*, 78 S.W.3d at 890.

*Lampley v. Town of Chapel Hill*, M2013-01335-COA-R3-CV, 2014 WL 1512816, at *4, 2014

Tenn. App. LEXIS 208, at *11 (Tenn. Ct. App. Apr. 15, 2014).

In the absence of fraud or mistake, the courts must construe contracts as written. *Frank Rudy Heirs Assocs. v. Sholodge, Inc.*, 967 S.W.2d 810, 814 (Tenn. Ct. App. 1997).  They must take a position of neutrality toward the parties, *Hillsboro Plaza Enters. v. Moon*, 860 S.W.2d 45, 47 (Tenn. Ct. App. 1993), and must not concern themselves with the contract's wisdom or folly. *Chapman Drug Co. v. Chapman*, 207 Tenn. 502, 516, 341 S.W.2d 392, 398 (1960); *Brooks v. Networks of Chattanooga, Inc.*, 946 S.W.2d 321, 324 (Tenn. Ct. App. 1996).   Instead, the

courts must enforce the parties' agreement according to its plain terms, *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc*., 521 S.W.2d 578, 580 (Tenn. 1975), and must be careful not to rewrite an agreement under the guise of construing it. *Marshall v. Jackson & Jones Oil, Inc*., 20 S.W.3d [678,] 682 [(Tenn. Ct. App. 1999)].

*Hoefler v. Hoefler*, No. M1998-00966-COA-R3-CV, 2001 WL 327897, at *3, 2001 Tenn. App. LEXIS 225, at *10-11 (Tenn. Ct. App. Apr. 5, 2001).

Reading the wording of each subsection referenced above in its plain terms, the court finds that subsection (d) of the first paragraph is intended as a cross-collateralization, or dragnet, clause and that the Millers contractually agreed that all collateral pledged – joint or individually owned – would secure all current and future debts owed Tennessee State Bank by either Debtor or Miller, jointly or individually, in addition to securing the Valley Mart Exxon Note, irrespective of the nature or character of the property and debt involved.  And although not expressly stated, the court also finds that the Millers' contractual agreement concerning cross-collateralization, in essence, indicates the Millers' intention to forgo any rights that they may have had as tenants by the entirety.

"Tennessee has long recognized the general validity of 'dragnet clauses' in trust deeds." *Duncan v. Claiborne Cnty. Bank*, 705 S.W.2d 663, 664 (Tenn. Ct. App. 1985).  Indeed, dragnet clauses are statutory under Tennessee law:

> Any contract, security agreement, note, deed of trust, or other security instrument, in writing and signed or endorsed by the party to be bound, that provides that the security interest granted therein also secures other provisions or future indebtedness, regardless of the class of other indebtedness, be it unsecured, commercial, credit card, or consumer indebtedness, shall be deemed to evidence the true intentions of the parties, and shall be enforced as written; provided, that nothing herein shall limit the right of any party to contest the agreement on the basis that it was procured by fraud or limit the right of any party to assert any other rights or defense provided by common law or statutory law in regard to contracts.

Tenn. Code Ann. § 47-50-112(b).  Interpreting the statute, Tennessee courts recognize and

enforce dragnet clauses so long as "the language contained in the dragnet clause is plain and

unambiguous such that a layman could comprehend its meaning.  If the language is plain and

unambiguous, a court must consider the intention of the parties to a deed of trust to be what the

plain language therein declares it to be." *In re Lemka*, 201 B.R. 765, 768 (Bankr. E.D. Tenn.

1996) (citations omitted); *see also Higdon v. Regions Bank*, No. E2009-01298-COA-R3-CV,

2010 WL 1924019, at *5, 2010 Tenn. App. LEXIS 331, at *14 (Tenn. Ct. App. May 13, 2010)

("In Tennessee, future advance clauses in security instruments are recognized as valid and are

enforceable according to their terms if the relevant language is plain and unambiguous.").

While acknowledging that the Leasehold Deed of Trust contains a valid dragnet clause,

Debtor argued that because the clause includes both herself and Miller, the dragnet language is

limited solely to the Millers' joint debts.  This argument, however, is not supported by case law.

Language such as "'or any of them,' 'jointly or severally' or similar such language,

which is the customary method to include the future debts of any of the parties[,]" would

evidence an intent that a deed of trust "secure[s] the individual debts of each." *Lemka*, 201 B.R.

at 769 (citing cases); *see also In re Brooks*, 274 B.R. 495, 500 (Bankr. E.D. Tenn. 2002) (finding

the term "grantors" to be ambiguous and [i]f the agreement was supposed to refer to each of

them individually, it could easily have said 'the grantors or either of them', 'the grantors or any

of them', or an equivalent phrase").  In this case, the language in the Leasehold Deed of Trust

expressly provides that the dragnet clause includes "the payment of any and all other

indebtedness, whether direct or indirect, now or hereafter owing to Lender by ***Borrower, or by***

***any individual or entity included in the term Borrower,*** regardless of the type, class, or purpose

of any such other indebtedness, and however such indebtedness is evidenced." [Trial Ex. 2 at p. 9

15

(emphasis added).]  This language is found not only in the Leasehold Deed of Trust but also in every other deed of trust securing Debtor's and Miller's joint and individual obligations to Tennessee State Bank.  [*See e.g.*, Trial Ex. 1 at p. 8; Trial Ex. 3 at p. 7-8; Trial Ex. 27 at p. 4.] As such, this language serves to bind the collateral pledged by Debtor and Miller, both jointly and severally, in every note for every obligation that either or both have with Tennessee State Bank.[6]  Under this binding cross-collateralization provision and the provision in paragraph 5 of the Leasehold Deed of Trust for application of payments "in such order and manner as are determined by Lender in its sole discretion, subject only to the provisions of this Instrument" [Trial Ex. 2 at p. 9], the Bank has the discretionary authority to use the excess proceeds to satisfy an individual debt of Debtor's, an individual debt of Miller's, or any of their joint debts, in whatever order it chooses.

This determination accords with the opinion previously delivered by this court from the bench on September 8, 2014, in connection with the confirmation of Miller's Chapter 11 plan: "[I]t is undisputed that even though each of the thirteen notes [provided for in Miller's plan] is secured by different properties, they are cross-collateralized, with the result that all collateral pledged by the Debtor for each individual note secures every other obligation of the Debtor to Tennessee State Bank.  In other words, all collateral pledged stands for all debt incurred." Because Debtor's joint debts to Tennessee State Bank were included within the thirteen debts referenced by the court, that determination concerning the cross-collateralization of debts based

---

[6] Debtor presented evidence to show that the Future Advance clause in the Leasehold Deed of Trust is inoperable as to Miller's individual debt relating to the Thunder Mountain property because the Thunder Mountain Note does not reference the Leasehold Deed of Trust as additional security for the Thunder Mountain debt.  The court agrees with Debtor on this point; however, the dragnet clause in the Leasehold Deed of Trust is not limited to Future Advances as defined in that agreement.  Again, the relevant language provides that the indebtedness includes "the payment of any and all other indebtedness, whether direct or indirect, now or hereafter owing to Lender by Borrower, *or by any individual or entity included in the term Borrower*, regardless of the type, class, or purpose of any such other indebtedness, and however such indebtedness is evidenced, including, *without limitation*, the repayment of any Future Advances made by Lender pursuant to paragraph 20 of this Instrument."  [Trial Ex. 2 at p. 9 (emphases added).]

upon the foregoing language in the deeds of trust cannot be true for Miller's case without also being true for Debtor's case.

The court is not persuaded by Debtor's argument that she was unaware that the Leasehold Deed of Trust contained cross-collateralization language or a dragnet clause or that the collateral would also serve as security for any current or subsequent loans obtained by Miller.  Debtor is a sophisticated businesswoman who would be familiar with and understand the concept of cross-collateralization of debts.  Debtor has owned her own movie rental business and continues to manage the Millers' cabin rental business.  The testimony of Shelley Spurgeon, which was collaborated by Debtor's own, was that Debtor took care of the financial aspects of the Millers' businesses and she was the Bank's contact person concerning any of the Millers' financial accounts.  Debtor also testified that she prepared and reviews all of the bank statements for the Millers' businesses and that she prepares not only her own Chapter 11 monthly operating reports but also those for Miller's Chapter 11 case, all of which require a significant knowledge of accounting and finance principles.

Likewise, Debtor's testimony that she was unaware of the inclusion of the clause because she did not read the Leasehold Deed of Trust is not persuasive, especially in light of her business background and sophistication.  "Tennessee courts have held that one is under a duty to learn the contents of a written contract before signing it and if, without being the victim of fraud, the party fails to read the contract or otherwise fails to learn its contents, then the party signs the contract at his or her peril and is estopped to deny [her] obligation."  *Rochelle v. Grange Mut. Cas. Co.*, No. M2011-02697-COA-R3-CV, 2012 WL 3104901, at *9, 2012 Tenn. App. LEXIS 529, at *26 (Tenn. Ct. App. July 31, 2012) (citations omitted).  Debtor's failure to read and be

knowledgeable about the contents of the Leasehold Deed of Trust rests solely on her shoulders,

and she is bound by the terms of the dragnet clause therein.[7]

The Bank also provided proof that, notwithstanding her assertions to the contrary, Debtor

does, in fact, have a legal connection to the Thunder Mountain project.  At trial, when presented

with the Partnership Agreement of MM&M Partners, which was marked as Trial Exhibit 57,

Debtor acknowledged that she held a 98% interest and her two sons held a 2% interest in

MM&M Partners, one of the grantors listed on the Thunder Mountain Deed of Trust (along with

Miller, Charles A. McGinnis, and Little Cove Developers). [*See* Trial Ex. 27 at p. 3.]  The court

allowed Debtor to submit additional evidence to rebut the Bank's evidence, and she filed as

supplemental evidence the Affidavit of Gerald L. Miller dated April 3, 2015, which states that

Miller used MM&M Partners but ceased using it due to worry over causing tax issues for his two

---

[7] Tennessee State Bank also argued that Debtor waived her right to claim that the proceeds had to be paid towards property owned as tenants by the entirety under the following paragraph of the Leasehold Deed of Trust:

> 21.  WAIVER.  . . . .  GRANTOR EXPRESSLY WAIVES ALL LEGAL, EQUITABLE, AND STATUTORY RIGHTS OF REDEMPTION, EXEMPTION OR HOMESTEAD, ALL RIGHTS ARISING BY VIRTUE OF MARRIAGE, AND ALL OTHER SIMILAR EXEMPTIONS AND RIGHTS ARISING  UNDER OR CREATED BY AN APPLICABLE STATUTE OR JUDICIAL DECISION, INCLUDING, WITHOUT LIMITATION TCA 66-8-101, ET. SEQ.

[Trial Ex. 2 at p. 11.]  Although this language clearly applies to rights afforded to spouses because of their position as married persons, such as testamentary or domestic relations rights, Tennessee law is unclear whether such language would also apply to the common-law doctrine of tenancy by the entirety.  *But see Thornton v. Countrywide Home Loans, Inc*., Nos. W1999-02086-COA-R3-CV, W1999-02087-COA-R3-CV, 2000 WL 33191366, at *1, *4, 2000 Tenn. App. LEXIS 717, at *13 (Tenn. Ct. App. Oct. 23, 2000) (suggesting that a contractual provision by which a spouse "joins herein for purposes of conveying any and all rights arising by virtue of her marriage" (and the deed "specifically convey[ed] all . . . 'rights, claims, and interest of every kind, character and description whatsoever'") unambiguously means that such spouse "clearly and effectively conveyed her entire interest in the . . . property in order to secure her husband's loans" because the deed of trust did not "contain[] any language expressly conveying only [her] future right of survivorship").  The law is clear, however, that waiver is asserted as a defense to breach-of-contract claims and "cannot be asserted . . . as an offensive weapon."  *GuestHouse Int'l, LLC v. Shoney's N. Am. Corp*., 330 S.W.3d 166, 202 (Tenn. Ct. App. 2010).  Regardless of whether the waiver provision waived Debtor's tenancy-by-the-entirety rights, as previously discussed, the Millers are bound by the language of the Leasehold Deed of Trust which clearly brought the sale proceeds at issue, whatever their character, within the scope of "the payment of any and all other indebtedness, whether direct or indirect, now or hereafter owing to Lender by Borrower, or by any individual or entity included in the term Borrower, regardless of the type, class, or purpose of any such other indebtedness, and however such indebtedness is evidenced, including, without limitation, the repayment of any Future Advances made by Lender pursuant to paragraph 20 of this instrument."  [Trial Ex. 2 at p. 9.]

sons and asserting that "it is now dormant." [Doc. 438 at ¶ 8.] This supplemental evidence, however, does not address Debtor's ownership interest in the partnership, and irrespective that the entity is dormant, the fact remains that by virtue of her 98% ownership in MM&M Partners, Debtor has a legal relationship to the Thunder Mountain project.

More importantly, Debtor scheduled the 130-acre Thunder Mountain project as real property in which she has an "expectancy interest" that is owned jointly. [Trial Ex. 51 at p. 1.] She also scheduled an additional 74.39 acres at 1441 Little Cove Road as a jointly owned "expectancy interest." [Trial Ex. 51 at p. 2.] Indeed, Debtor has proposed in the Third Amended Plan to pay the delinquent property taxes on the 74.39 acres as a Class IID claim. That property was identified by Miller in his Confirmed Plan as "1441 Little Cove Road (also known as Thunder Mountain)" [Trial Ex. 7 at p. 7], and he expressly identified it as entireties property in the Confirmed Plan [Trial Ex. 7 at p. 15].

Under all these circumstances, the court finds that the dragnet clause is enforceable to allow the Bank to apply sale proceeds at its discretion to other cross-collateralized property.

## 2. EQUAL CREDIT OPPORTUNITY ACT

Debtor also argued that Tennessee State Bank's enforcement of the cross-collateralization clause violates the Equal Credit Opportunity Act (ECOA), which states that a lender may not require a personal guaranty from a loan applicant's spouse unless the lender has determined the applicant is not creditworth y. Debtor cited the following provision in her brief:

> It shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction . . . on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract).

15 U.S.C. § 1691(a)(1). This provision is implemented through Federal Reserve Regulation B, 12 C.F.R. part 202, which provides, in part, that "a creditor shall not require the signature of an

applicant's spouse or other person, other than a joint applicant, on any credit instrument if the

applicant qualifies under the creditor's standards of creditworthiness for the amount and terms of

the credit requested."  12 C.F.R § 202.7(d)(1).  In the Sixth Circuit, in order to establish a prima

facie case of credit discrimination, a party must show "(1) Plaintiff was a member of a protected

class; (2) Plaintiff applied for credit from Defendants; (3) Plaintiff was qualified for the credit;

and (4) despite Plaintiff's qualification, Defendants denied her credit application."  *Mays v.*

*Buckeye Rural Elec. Co-op, Inc.*, 277 F.3d 873. 877 (6th Cir. 2002).  Here, the record reflects

that Debtor was not asked to co-sign or guarantee the Thunder Mountain or any other property

included within the dragnet clauses of each deed of trust, including the Leasehold Deed of Trust.

No credit application was denied.  The Bank simply required the Millers – who were parties to a

commercial transaction – to execute a dragnet clause in various deeds of trust providing for the

cross-collateralization of a number of other commercial loans in which either or both of the

Millers were involved.  That the Bank intends to apply excess proceeds in accordance with the

cross-collateralization provisions in the Leasehold Deed of Trust is not tantamount to requiring

Miller to have Debtor act as a co-signor or guarantor for the Thunder Mountain debt.

> Furthermore, the ECOA itself defines "adverse action" as:

> a denial or revocation of credit, a change in the terms of an existing credit
> arrangement, or a refusal to grant credit in substantially the amount or on
> substantially the terms requested. Such term does not include a refusal to extend
> additional credit under an existing credit arrangement where the applicant is
> delinquent or otherwise in default, or where such additional credit would exceed a
> previously established credit limit.

15 U.S.C. § 1691(d)(6).  ECOA also does not prohibit "***[a]ny action*** or forbearance relating to an

account taken ***in connection with*** inactivity, ***default, or delinquency*** as to that account."  12

C.F.R. § 202.2(c)(2)(ii) (emphases added).  Because ECOA "was never intended to eliminate a

'creditor's right to make a rational decision about an applicant's credit worthiness[,]' . . . an

ECOA violation cannot be shown by simply alleging that the creditor is attempting to collect on

the debt." *Lewis v. ACB Bus. Servs., Inc*., 135 F.3d 389, 406 (6th Cir. 1998) (quoting Equal

Credit Opportunity Act Amendments of 1976, Pub. L. No. 94-239, 1976 U.S.C.C.A.N. 403, 404-

05)). Debtor's ECOA argument is without merit.

### 3. EQUITY

Finally, Debtor relies on 11 U.S.C. § 105(a), urging the court to use its inherent equitable

powers in connection with its broad discretion to approve plans of reorganization to approve the

Third Amended Plan and its provision for allocation of the Valley Mart Exxon sale proceeds.

Section 105(a) provides, in material part, that "[t]he court may issue any order, process, or

judgment that is necessary or appropriate to carry out the provisions of this title."  "Although §

105(a) provides a bankruptcy court with the authority to take whatever action is appropriate and

necessary to exercise its jurisdiction, § 105(a) is not without limits, may not be used to

circumvent the Bankruptcy Code, and does not create a private right of action unless it is

invoked in connection with another section of the Bankruptcy Code." *Perry v. EMC Mortg.

Corp. (In re Perry)*, 388 B.R. 330, 336 (Bankr. E.D. Tenn. 2008).  In this case, the court cannot

find a basis under § 105(a) to override the plain cross-collateralization provision of the

Leasehold Deed of Trust.  To do so would undermine the governing law of the contract, i.e.,

Tennessee law – something that this court will not do.  As previously stated, courts must enforce

contracts by their terms while taking care not to rewrite them under the guise of construing them.

*See Hoefler*, No. M1998-00966-COA-R3-CV, 2001 WL 327897, at *3, 2001 Tenn. App. LEXIS

225, at *10-11 (citations omitted).

The court similarly finds no merit in Debtor's argument that it should apply the

marshalling-of-assets doctrine which "rests upon the principle that a creditor having two funds to

satisfy his debt may not, by his application of them to his demand, defeat another creditor, who may resort to only one of the funds." *Meyer v. United States*, 375 U.S. 233, 236 (1963).  The Sixth Circuit has held that under this doctrine, "'[t]he bankruptcy court has the power to order a creditor who has two funds to satisfy his debt to resort to the fund that will not defeat other creditors.'" *Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648, 656 (6th Cir. 2002) (quoting *In re A.H. Robins Co*., 880 F.2d 694, 701 (4th Cir. 1989)). The court finds that this doctrine has no application in Debtor's case, as Debtor testified that she has sufficient assets to satisfy all of her creditors.  Thus, Tennessee State Bank's application of the excess proceeds to the Thunder Mountain obligation will not in any way defeat or hinder any other of Debtor's creditors.

In summary, the court rejects Debtor's defenses to Tennessee State Bank's objection to confirmation concerning application of the excess proceeds being held from the sale of the Valley Mart Exxon Leasehold.  Because Tennessee State Bank is entitled to apply the proceeds in accordance with the dragnet clause contained in the Leasehold Deed of Trust, Debtor's Chapter 11 plan cannot be confirmed as proposed with respect to Class IV.

## B.  UNSECURED CLAIM

Having determined that the Bank may apply the proceeds as it desires in accordance with the cross-collateralization clause in the Leasehold Deed of Trust, the court finds that the Bank, in fact, will possess an unsecured claim.  The aggregate amount of the Bank's proofs of claim filed in Debtor's case totals $1,122,110.52.  After applying the proceeds from the Valley Mart Exxon Leasehold sale as reflected in the Bank's breakdown marked as Trial Exhibit 38, Debtor's aggregate pre-petition debt owed to Tennessee State Bank, without including accrued interest since the proofs of claim were filed on April 18, 2013, or post-petition attorneys' fees, is

$956,220.18.  Debtor proposes to pay the Bank through the sale of the properties securing the loans as follows:

- The Parkway Property, which Debtor values at $400,000.00, against which the Bank's claim, as of April 18, 2013, is $714,749.72;

- The Campground Office, which Debtor values at $225,000.00, against which the Bank's claim, as of April 18, 2013, is $145,613.53; and

- The Happy Hollow Road property, which Debtor values at $200,000.00, against which the Bank's claim, as of April 18, 2013, is $85,843.87.

[Trial Ex. 34 at p. 6.]  Assuming Debtor's cumulative value of $825,000.00 is realized from the respective sales of these properties, notwithstanding real estate commissions and closing fees, Debtor's indebtedness to the Bank will be, at a minimum, $131,220.18.[8]  This figure, however does not include accrued interest from April 18, 2013, through the Effective Date of the plan. Nor does it include post-petition attorneys' fees to which the Bank is entitled or any past-due real property taxes that Debtor proposes to pay from the proceeds of the properties' sales.  The Third Amended Plan contains the following provision for payment of any unsecured non-priority deficiency claim of the Bank:  "Should there be a deficiency on TSB claims, Debtor will use unencumbered assets or disposable income under 1129(a)(15) to meet such obligation to TSB." [Trial Ex. 34 at p. 10.]  Because the Third Amended Plan does not provide any time frame for payment of TSB's unsecured claim, the plan is unconfirmable.  Any amended plan must include

---

[8] Debtor valued the Valley Mart Exxon Leasehold at $451,000.00 in the Third Amended Plan.  The actual purchase price received for that property was $465,000.00, which included inventory.  [*See* Trial Ex. 34 at p. 6 n.2.]  Based upon this value-to-sale ratio, the values accepted by the parties in Miller's Confirmed Plan [*see* Trial Ex. 7], and the Bank's failure to object to Debtor's valuations, the court accepts the valuations reflected in Debtor's Third Amended Plan as indicative of the fair market value for each.

23

not only the method of payment but also a time frame for payment of the Bank's unsecured claim.

## C.  BEST INTERESTS OF CREDITORS

Tennessee State Bank further argues that the Third Amended Plan does not satisfy § 1129(a)(7).  Specifically, the Bank argues that it would receive more through a Chapter 7 liquidation than it will receive under the Third Amended Plan because there is no time period proposed for payment of its unsecured claim.  The Bank also argues that the Third Amended Plan makes no provision for payment of the $75,425.24 proof of claim filed by the Sevier County Clerk & Master.[9]

The "best interests" requirement imposed by § 1129(a)(7) requires that any creditor voting to reject a plan "must receive, under the plan, at least what they would have received if the debtor were to liquidate under Chapter 7." *In re Christian Faith Assembly*, 402 B.R. 794, 799 (Bankr. N.D. Ohio 2009) (citing *Bank of Am. Nat'l Trust & Sav. Assoc. v. 203 N. La Salle St. P'ship*, 526 U.S. 434, 441 n.13 (1999)).  In deciding whether an impaired creditor would receive a greater amount in a Chapter 7 liquidation case, the court must consider, as of the effective date of the plan, (1) the amount of the creditors' claims and (2) the liquidation value of the assets of the estate.  *See In re SAI Holdings Ltd.*, No. 06-33227, 2007 WL 927936, at *8, 2007 Bankr. LEXIS 1051, at *26 (Bankr. N.D. Ohio Mar. 26, 2007).  Valuation, which "is to be based on evidence not assumptions, but . . . is not an exact science," *In re Draiman*, 450 B.R. 777, 809

---

[9] The parties listed as an issue in the Joint Pretrial Statement the question of whether the Bank has standing to challenge the proposed treatment of Sevier County's property tax claims.  The Bank, however, offered no argument on the issue, nor did Debtor address the issue in her brief.  Further, no evidence was presented at trial concerning standing.  Nevertheless, because treatment of the past-due property tax claims directly affects the timing and amounts to which the Bank will be entitled as the properties are sold and/or the Third Amended Plan is implemented, the court finds that the Bank does have standing to bring the issue before the court as part of its proof that the Third Amended Plan is not confirmable as proposed.

(Bankr. N.D. Ill. 2011), is determined "as of the effective date of the plan," 11 U.S.C. §

1129(a)(7)(A)(ii).

> "The requirement that the 'value' of the property to be distributed be determined
> 'as of the effective date of the plan' incorporates the principle of the time value of
> money." There is no doubt, therefore, that a Chapter 11 plan does not satisfy the
> best-interests-of-creditors test if the debtor, rather than paying a creditor the
> amount it would receive in a Chapter 7 liquidation in full on the effective date of
> the plan, proposes instead to pay that same amount over time. In order to satisfy
> the best-interests-of-creditors test, a debtor making deferred cash payments must
> pay more than the liquidation amount in order to compensate creditors for the
> time value of money lost because of the delay in payment.

*In re Hockenberry*, 457 B.R. 646, 653-54 (Bankr. S.D. Ohio 2011) (quoting *Till v. SCS Credit

Corp.*, 541 U.S. 465, 486-87 (2004)).

Tennessee State Bank argued that Debtor did not provide for payment of the $75,425.24

claim filed by the Sevier County Clerk & Master for the 2009-2012 past-due taxes. This

argument, however, is incorrect. The Third Amended Plan clearly addresses past-due property

taxes in Class IIC (for 2012 property taxes) and Class IID (for 2011 and older property taxes).

[Trial Ex. 34 at pp. 4-5.] Class IID includes two additional properties, the commercial shopping

center on Wears Valley Road (Shopping Center) and the unimproved property at Little Cove

Road, which is identified in Miller's Confirmed Plan as at least part of the Thunder Mountain

Property [*see* Trial Ex. 7 at p. 7], and proposes to pay $11,371.00 on the effective date or in

monthly payments of $214.58 (which includes 5% interest) for up to sixty months. This amount

matches the amount set forth in Miller's Confirmed Plan at Class 3c. [Trial Ex. 7 at p. 7.] There

is, however, some inconsistency in payment of the same property taxes between Miller's

Confirmed Plan and Debtor's Third Amended Plan. Specifically, Miller's Confirmed Plan

identifies as Class 3d certain property tax claims, including the $41,706.63 owing on properties

owned by Miller jointly with others, including Debtor. Miller's Confirmed Plan provides that

25

"[t]he one-half of these taxes not paid through this Plan will be paid by the joint owners including the Debtor's wife, Karen Miller, in her bankruptcy case, Chapter 11 No. 12-33943." [Trial Ex. 7 at p. 8.]  Debtor's Third Amended Plan does not separately identify the taxes in the same way as Miller's Confirmed Plan.  It appears, however, that such taxes are included in Class IID of the Third Amended Plan and that such taxes will be paid as the properties are sold.  [Trial Ex. 34 at p. 5.]  Ultimately, Miller's Confirmed Plan provides that the taxes identified as Class 3d "will be paid in full from sales proceeds of the properties as they are sold."  [Trial Ex. 7 at p. 8.]  Thus, although some of the language is inconsistent and confusing, the court finds that Debtor's Third Amended Plan does provide for all of the property taxes to be paid in full from the sales of the properties.

Nevertheless, the court finds that the Third Amended Plan does not satisfy the best-interests test as to Tennessee State Bank.  As reflected above, the total amount of the Bank's remaining proofs of claim (after credits are applied for the sale of the Valley Mart Exxon Leasehold) is $956,220.18.  Debtor's own valuation of the respective properties totals $825,000.00, leaving a deficit of $131,220.18, without including post-petition interest and attorneys' fees owed to the Bank under the terms of the respective notes and deeds of trust. Additionally, under the Third Amended Plan, payment of past-due real property taxes of $11,371.00 for taxes due prior to 2012 on the Shopping Center and Little Cove Road (i.e., Thunder Mountain) properties are to be made on the Effective Date or within sixty months at a monthly rate of $214.58, and past-due real property taxes totaling $12,808.00 for 2012 are to be paid either on the Effective Date or within sixty months at a monthly rate of $241.70.  The Third Amended Plan proposes to sell the properties securing the Bank's debts, which are also subject to payment of any remaining taxes owed against them as well as real estate commissions and

costs of sale; however, Debtor proposes to extend the time over which she may market the

properties through twenty-four months after the Effective Date (which is defined as sixty days

after confirmation), after which, if the properties are not under sales contracts, the Bank will be

granted stay relief. [*See* Trial Ex. 34 at p. 8.]  The only payment Debtor proposes to make to the

Bank over that time is a monthly payment of $1,262.56 as to the Parkway Property "for the

shortfall of Lease with the Landlord after credit for the payments collected by the Bank from

Subtenant Stokely Hospitality Enterprises as per the Order entered on August 9, 2013." [Trial

Ex. 34 at p. 7.]

      At trial, Debtor testified that she currently has sufficient assets to pay her unsecured

creditors and the past-due taxes, leaving only the joint debts to Tennessee State Bank

outstanding.  Indeed, Debtor's Schedule A reflects $380,000.00 of unencumbered, non-exempt

real property, not including non-exempt assets reflected on Schedule B (e.g., approximately

$80,000.00 in cash or bank accounts). [Trial Ex. 51 at pp. 1, 3, 5.]  Although the Third Amended

Plan proposes liquidation of all properties securing the debt to the Bank, if Debtor were in a

Chapter 7 liquidation and her unencumbered, non-exempt assets were sold by a Chapter 7 trustee

for payment to creditors, the Bank clearly would receive more in a Chapter 7 liquidation than

under the Third Amended Plan.  At liquidation, all property taxes would be paid so that interest

would not continue to accrue to the detriment of the Bank, as proposed under the Third Amended

Plan.  The Bank would receive payments sooner and in a greater amount because the Bank

would realize all of the eventual sale proceeds, excluding past-due real property taxes and real

estate commissions and costs of sale.  For these reasons, the Third Amended Plan, as proposed,

does not meet the requirements of § 1129(a)(7).

## E.  FAIR AND EQUITABLE

Finally, Tennessee State Bank argued that the Third Amended Plan is not fair and

equitable under § 1129(b) because the case was filed twenty-eight months ago, and Debtor

proposes to market all of the secured properties for another twenty-four months after

confirmation.  Additionally, the Bank argued that the Third Amended Plan does not include a

time frame within which Debtor will pay the Bank's unsecured claim.  To strike a balance

between two principal goals of Chapter 11 – "facilitating the reorganization and rehabilitation of

the debtor as an economically viable entity, and protecting creditors' interests by maximizing the

value of the bankruptcy estate" – Chapter 11 debtors must provide adequate means for

implementation of their plans. *In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 303 (3d Cir.

2010).  "[This] requires only an 'adequate means' for the Plan's implementation, it does not

require the Debtor to provide an alternate means of generating income." *Draiman*, 450 B.R. at

795.

> To be confirmed, a plan may not treat a dissenting class unfairly, and must not
> unduly shift the risk of reorganization.  To determine whether the proposed
> arrangement imposes impermissible risk shifting upon the primary secured
> creditor, a court will consider:  (i) the debtors' demonstration of feasibility; (ii)
> the protections and risks to the secured creditor, and (iii) the general
> reasonableness of the proposals in light of the circumstances.

*In re TCI 2 Holdings, LLC*, 428 B.R. 117, 168 (Bankr. D.N.J. 2010) (citations omitted).

Based upon the record, the court finds that the Third Amended Plan's treatment of the

Bank is unfair and inequitable in that it proposes to extend the time limits imposed by Miller's

Confirmed Plan as to the properties owned by Debtor and Miller jointly.  Miller's Plan was

confirmed on September 23, 2014, and provides that in the event that the properties jointly

owned with Debtor are not sold within eighteen months from the Effective Date, i.e., by March

21, 2016, Tennessee State Bank shall be granted stay relief as to the properties. [Trial Ex. 7 at p.

28

12.]  Debtor was intricately involved in Miller's confirmation process, as was Tennessee State

Bank.  Had Debtor not agreed with the timelines for sale of the jointly owned properties, she

could have objected or otherwise raised that issue.  She, however, did not and is bound – as are

all other creditors in Miller's case – by his Confirmed Plan.  *See* 11 U.S.C. § 1141(a) ("[T]he

provisions of a confirmed plan bind the debtor . . . and any creditor . . . , whether or not the claim

or interest of such creditor . . . is impaired under the plan and whether or not such creditor . . .

has accepted the plan.").  The court finds that it is unfair for Debtor, in her plan, to require

Tennessee State Bank, which would be entitled under Miller's Confirmed Plan to stay relief for

unsold properties as of March 2016, to forgo proceeding against the properties for more than

another year (calculated as twenty-four months from the Effective Date of Debtor's plan) while

she continues to market them.  The court likewise finds that this proposed treatment shifts the

risk onto the Bank rather than Debtor, unduly burdens the Bank, and unfairly discriminates

against the Bank.  It is unreasonable for Debtor to be allowed additional time beyond what was

already ordered by this court in Miller's Confirmed Plan, especially in light of the fact that she

participated in Miller's case and was well aware of the time restrictions imposed by his plan.

### III. CONCLUSION

For the foregoing reasons, Debtor's Third Amended Plan filed on January 30, 2015, does not satisfy the requirements of 11 U.S.C. § 1129 and cannot be confirmed as proposed. The Objections to Confirmation filed by Tennessee State Bank will be sustained, and confirmation will be denied. An order consistent with this Memorandum shall be entered.

FILED: May 1, 2015

BY THE COURT

*Suzanne H. Bauknight*

SUZANNE H. BAUKNIGHT
UNITED STATES BANKRUPTCY JUDGE